The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Amy C. Lannard presiding. Good morning. The court is taking up case number 4-24-0261 Edward Sobczyk v. Board of Trustees of the Rockford Firefighters' Pension Fund et al. And with that counsel for the appellant, if you'll please state your name for the record. Sure. My name is Gregory Tewitt. And counsels for the appellee starting with the Board of Trustees of Rockford Pension Fund. Good morning. I am John Modolinski here for the Rockford Firefighters' Pension Fund's Board of Trustees. Good morning, Your Honors. Angela Hammer for the City of Rockford. My understanding is that the appellee will be splitting time. Mr. Modolinski will have 15 minutes. Ms. Hammer will have 5 minutes initially. Is that correct? Yes. Yes, Your Honor. Thank you. And with that, Mr. Tewitt, you may begin your argument. And is there a limitation of the time? I hope I don't reach any limitation. There will be a clock. Initially the appellant is granted 20 minutes for argument and then you would have 5 minutes in rebuttal or you Okay. Thank you. Then let's go with 15 minutes, I guess, on direct and 10 on... You'll have 20 on direct. Okay. Yes. Thank you. May it please the court. It's been a while since I've been the appellate court and this is the first time I've done one in Zoom. So it's a little different, but thank you for hearing us today. I represent Edward Sobchak, who is a long-time firefighter for the City of Rockford. And we're here on his application for duty disability benefits and also occupational disease disability benefits, both under the Pension Act. I think the main characteristic of the Duty Disability Act is that we have to show that an act of duty or the cumulative acts or the cumulative effects of acts of duty, multiple acts, leads to a physical or mental disability where they can't perform their work as a firefighter. And if that's the case, they shall be entitled to a disability pension. The occupational disability provision pertains to performing duties and it acknowledges that firefighting duties include and subject the individual to heavy smoke, fumes, and carcinogenic, poisonous, toxic, or chemical gases from those fires that they may be fighting. And that we have to prove that the conditions arise out of and in the course of the employment for that provision. I think we're mainly focused here on the duty disability portion of this. And because I don't think there's any dispute that he's disabled, and I don't think there's any dispute that he was exposed on the job to a variety of carcinogenic substances. He worked for many years as a firefighter and paramedic. He then became a captain with Rockford Fire Department and he testified to the types of carcinogens that he was exposed to on the job. And I think the primary one that we're focused on here today is during what's called the overhaul process, which is when the fire is struck out, but the firefighters remain and they go through the site of the fire and they're poking around to make sure that there's nothing else that pops up and catches fire again. And for many, many years, when they did this procedure, they were not wearing any type of protective equipment. And I think he testified to that. And then another question. Sure. Sure. All of these are facts that have been determined by the board, correct? Well, I don't know how much they went into them, but the facts are in the record, both testimony of Mr. What's your legal issue? You have one legal issue. What is it? There's well, I think there's more than one legal issue, but the main brief one issue, I'm sorry. I may brief one legal issue. What is it? The issue that I briefed was that his exposure to carcinogens was a factor in the development of his disability. And the other portion of that is that the board did not present and did not present the legal issue properly to either the members of the, of the board and to the doctors that they used for their IME evaluations. There's no evidence within the record that shows what legal issues were presented to the doctors. You can kind of interpret maybe what they were. If you read the doctor's report, because they seem to have almost a checklist of factors that they address, but they, they were very basic. They basically took the statute that I first referenced about acts of duty as if that is the causation standard. And then the same thing with the occupational disability. So our position is that the board committed an error of law by not providing the correct legal standard, both to the expert witnesses and to the board members themselves. Did you raise that to the board? Yes. How did you do that? How did I do that? Well, when I was first asked to speak after Ms. Clifford, the hearing officer who works for the same firm that the pension board represents, she said, here are the legal principles when she started out our discussion of the case. And afterwards I said, she said, do you, did you have any, did you have any response that I said, I'd like to give my opening statement. She said, no, not at this time. I said, okay. So then as soon as I was able to give my opening statement, I went through the legal principles and I stated that what the causation standard is and what we had to prove. I also put in a statement. The question was, the question that was asked of you was, is there anything that you would like to note about the legal principles at this point? And your response was no. My question is, why in the world, excuse me. My question is, why in the world, if at that point in time you were under the impression that they were operating under incorrect legal principles, would you not raise that point to them? I was not aware of the legal principles at that time, to be honest with you. You just read them to you. Well, they were stated, but they, they stated them. And that was what she said. And then I later said what my belief of the legal principles were of causation. And I also raised that in all of my questioning of the witnesses about causation. I also raised it in my brief that I presented to the board and making their determination of the issue of causation. So that, but we don't know what the doctors saw. I mean, I was not provided with any of that evidence. You talked through your brief about some legal memoranda. Yes. You never produce it. You never reference it other than in some vague sort of reference. Tell me about that. I have, I have never seen it. It was never turned over to me. Then how do we know there is one? Because it's referred to both by Ms. Clifford, that she gave it to the board members and also by the doctors who said they reviewed the memorandum of legal principles and then their reports. What's different about that than what read to you on the record at the outset? I don't know. It's not contained in the record. They could have easily placed that in the record. The doctors could have turned it over. Whose burden is it to produce a record for us? It's their burden to produce. Whose burden is it to produce a record for us on appeal? It's my bird, but I agree. I agree, but the record was already closed and it wasn't in there and it's referred to, but we don't know what the doctors were thinking when they were, when they were making their deliberations. And it is clear that it's like someone was charged with manslaughter. And then you just said, okay, you just presented evidence of manslaughter, but you didn't distinguish between involuntary manslaughter or voluntary manslaughter. The same thing here, the statute is in there, but the case law is much broader than the interpretation that the doctors made of the statute. They read the checklist form that said, is this an act of duty? But the case law, which was never produced to the doctors, I argued on the very first argument, I said, Prosdek is the case on causation and all of the factors and that you don't have to show it's the sole cause. You don't have to show that it is the main cause. You don't have to show that it was originated. All you have to do is show that the other factor, that being the exposure to the carcinogens was an aggravating factor or an exacerbating factor or a factor in the development of the condition. And, and that's what we did. And that's even there. Exactly, did the board get wrong? Pardon me? What exactly did the board get wrong in their legal interpretation? They just cited acts of duty in the forms that were sent to the doctors. I mean, the only things I got from the doctors were a short report. And then I also received a checklist that the doctor would fill out, but there was no discussion that they ever took into account that the exposure to the carcinogens and HPV, which we don't even know if he has HPV because we have a test, a DNA test that was done in November of 21, I think it was, that was negative for, for HPV. So there was that. I think Dr. Campbell pretty well explained that, didn't he? Oh, no, no, he didn't. Okay. Dr. Campbell, he said that, that over time it can deteriorate. Dr. Samo, who's the occupational medicine doctor here, again, Campbell's not an occupational medicine doctor. He's not an epidemiologist. He treats people, but he doesn't- He's a board certified oncologist specializing in thoracic head and neck malignancies. Right. But also Dr. Samo, who is, was their witness, who is an occupational medicine doctor, as is Dr. Orris, who's head of the UIC occupational medicine department, who studies occupational causes. Dr. Samo said he didn't have HPV. He says it right in his report. We have to rule out HPV as the cause of the condition. And Dr. Samo's opinion was that the negative test results of plaintiff's biopsy samples did not remove HPV as a cause because there are over a hundred different HPV varieties that have been tested for genotypes, but the two most common ones involved. Again, the testing only tested both the smear tests done at the hospital were for 16 and 18. Which are the two most common- Right. And that's what they said. That's what the doctors testified he had. And the two most common found to be caused by HPV. I'm sorry. Until the DNA test comes back, we know he doesn't have 16 and 18. That's what his treatment has been all directed towards, 16 and 18. We don't know. Dr. Campbell testified, he said that when the cancers spread and metastasize as they had by time of the November tests, they become more deranged and will oftentimes lose the HPV positivity. Correct? Correct. Okay. But that's one, that's his opinion. Dr. Samo believed that it ruled that test ruled out 16 and 18 HPV. So there's no other. So you have that opinion. You also have, but that we're getting off onto a tangent there because our position is even if he has HPV, the fact that he's exposed to carcinogens can be a factor. And I would point out the CDC has specifically stated, it's appellate exhibit 13 that, let's see, it usually takes years after being infected with HPV for cancer to develop. It's unclear if having HPV, it's unclear if having HPV alone is enough to cause oropharyngeal cancers. So you're saying we don't know if HPV causes oropharyngeal cancers or if other factors such as smoking or chewing tobacco interact with HPV to cause these cancers. HPV is not known to cause other head and neck cancers, including those of the mouth, larynx, lip, nose, or salivary glands. What's our standard of review? What's your standard review? Yeah. The question of law, which I believe it is since the proper standard was not used. It's de novo. If it's a mixture of law and fact, then it is, it's not manifest weight, but it's in between de novo and manifest weight. Clearly erroneous, I think would be the standard if it's a question of law and fact. So again- So counsel, what is the- Interpretation of, I'm sorry, go ahead. Go ahead. Sorry, Justice Yarman, go ahead. No, no, no, please. So counsel, what is the best evidence in the record that the opposite conclusion is readily apparent and that the board should have reached that or that the board's findings were unreasonable, arbitrary, or not based on any of the evidence? It is the best evidence of that in the record. Okay. One, the CDC statement that's regarding that HPV and smoking and which Dr. Lieberman, when I questioned him, I said, is that true? Do you agree with that? Yes. And I said, so then exposure to a carcinogen on the job could also be a factor. And he said, well, not the primary factor, but yes, it could be a factor, which then meets the prostate test right there. So that was Dr. Lieberman's testimony. We have Dr. Sammo, if you look at his evidence, when they're asking him on the occupational disability portion, is this, he changed his answer from being no, once he saw the HPV test to unsure in his form, his checkbox form. We have Dr. Orris, who is a head of epidemiology, occupational medicine at University of Illinois, Chicago. He's one of the most prominent experts in the field. Also Dr. Sammo, like I said, he said in his testimony that carcinogens, being exposed to carcinogens can cause cancer to quote bloom, which is again, it's a factor that's in the record. And there was also the individual who testified, Dan Zachar, who did the exact same job as my client. And actually Dan Zachar was my client and he had HPV, it's no question. But Dr. Witek, who is a treating surgeon and oncologist at the University of Wisconsin at Madison, clearly stated, and I quote, given the P16 positivity is very likely that HPV played a causative role in development of his cancer. We then had a long smoke in the development of head and neck and squamous cell cancer carcinomas. It is plausible to assume that the prolonged exposure to inhaled carcinogens could have contributed as cancer. This is supported by the development of other cancers and first responders, such as the 9-11 attack. He was satisfied with this discussion. But ultimately when I'm asking about what's clearly erroneous in the opposite conclusion, there was contradictory evidence before the board. And I think that's what Justice Jarman was suggesting is they made these findings. So what is the one thing you hang your hat on to say that the board, it's clear to this court that the board should have reached, not that they could have, but they should have reached the opposite conclusion or that their decision was unreasonable or arbitrary or that they didn't base it on any of the evidence. What is the one strongest argument? Well, again, I think the strongest argument is that multiple doctors, except for Dr. Campbell, stated that exposure, even if he had HPV, that the exposure to carcinogens could have been a factor. And two, that it does not appear that the board or the doctors were ever given the proper standard to consider during their deliberations. But they were. You gave it to them. They don't say that. It's not referred to in the decision of the board. There's no discussion. There's no discussion of CDC. There's no discussion of Dr. Lieberman's testimony. There's no discussion of the WITEC report. But you argue on the one hand, they didn't have the proper standard, and yet you argue on the other that I gave it to them. I gave it to them in my opening. I gave it to them in my questioning. I gave it to them in my closing. Right. But there's no evidence that they ever considered that. Or the doctors. Maybe they just considered it and decided you were wrong. Well, they didn't say that. They didn't articulate that. Okay. And also, Dr. Lieberman agreed with my position. And they don't even discuss that in their decision. So they clearly even, there's no evidence that they considered it. And that's all we're saying is send it back, telling them, look, you have to consider PROSDEC. Analyze this case under PROSDEC. They did not analyze the case under current case law, which says all you have to factor. There's no evidence that they did that. And then finally, on the occupational disability portion of it, there was discussion of the IARC monograph, which there was a monograph, I think it was done in 2007 that was discussed throughout the hearing. That monograph has been updated, is monograph number 132. And at the current time, they said firefighting itself, before they said firefighting might be a carcinogen to firefighters. Now they have raised that to level one. And they say, firefighting is a carcinogen. It's the highest rating you can give any, whether it's a material- If you'd like to finish your statement, you're welcome to do so. Thank you very much. No, I've already said what my position is. Thank you. All right. Thank you. And with that, whoever is arguing first for the appellee, is that you, Mr. Modalinski? Yes, it is, Your Honor. You may begin. Thank you, Your Honor, and may it please the court, counsel. Again, my name is John Modalinski, and I proudly represent the Board of Trustees of the Rockford Firefighters Pension Fund. And this court should affirm the board's decision to deny Edward Sopcich's applications for line-of-duty disability benefits and for occupational disease disability benefits. To be awarded those benefits, of course, Sopcich had to come forward with evidence showing a causal link between his cancer and his service as a firefighter. The board found on a conflicted record that he did not. The board accepted as true the testimony of its three independent medical examiners, including Dr. Campbell, a head and neck oncologist, and the board concluded that his cancer was caused by HPV, not the acts of duty. I want to address a few things head-on based on counsel's opening presentation, and first has to do with this legal standard thing. The board has always agreed that the Prosdick Standard applies. Throughout its entire process, the board has operated under that assumption that plaintiff and Sopcich did not have to prove primary causation, sole causation. He merely needed to prove some sort of causal nexus between his disability and his job duties to be entitled to the benefits that he sought. That is why when Ms. Clifford, the hearing officer, recited the legal principles, that there was no objection or additional statement from counsel. That's further why, at the conclusion of counsel's statement in opening, that there was no pushback from the hearing officer saying, no, no, no, hold on, wait a minute, you got the thing wrong. There is also no indication even later on throughout the process when counsel was examining the IME physician and stating this is what we believe the legal standard to mean under Prosdick, that there was any pushback from the board. In fact, the board's findings and decision is replete with evidence that it applied the correct standard. It knew what it had to do, it applied the law faithfully, and any suggestion that it did not is mere fiction. Furthermore, I wish to address this idea of the memorandum that was given to the IME physicians. First of all, IME physicians do not make legal causation decisions. That is reserved for the board. That has been determined by the Village of Oak Park case that we cited in our brief. Just like any other expert witness at trial, IME physicians can offer their best medical judgment on a question posed to them, but they cannot opine as to what the law is or what any conclusions of the case are. The IME physicians memorandum provides as a means of giving context to the situation. It is IME physicians, a memorandum that states this is what a disability benefit is, this is what you should be looking for. In particular, with the disability aspect of it, there are statutory constraints on what constitutes a permanent disability, quote, unquote, such as the fact that it has to last at least 12 months, things like that. So the memorandum was never admitted into the record at the board's hearing. There was no occasion to do that on the board's side because the board communicates with its IME physicians routinely. It sends scheduling things, it sends background information. All of that stuff doesn't make it into the record because why would it need to? Now, I believe Justice DeArmond hit this nail on the head in that why didn't plaintiff and subject decide to move for the memorandum to be admitted at the board's hearing? It's because this causation thing is a last-minute resort to avoid the manifest weight of the evidence standard, pure and simple. The memorandum issue wasn't addressed in subject's post-hearing brief even. The time to get it in was before the board under the administrative review law. By the time that this issue was first raised before the circuit court in counsel's opening brief, no less, it was far too late for either him to move it in or for us as the board to move it in because the record had closed. And moreover, as the panel has already pointed out, on appeal to this court, any absence in the record is not construed against the board. It can't be. The absence in the record has to be construed against the appellant. To the extent that this memorandum should have been or desired to be considered by the applicant, then it should have either been moved into evidence at the hearing or even as a last resort in the circuit court after we had put the administrative record on file. So returning to the merits of this case, we believe that this legal causation argument is nothing more than a front for a veiled attempt at overturning the board's factual determinations. And in fact, the panel heard about 12 minutes of sob check that solely had to do with the preferred bits of evidence that he agrees with. But on the other hand, the board's decision is firmly rooted in the record. Again, we already talked about Dr. Campbell being an expert and a board certified oncologist. This is important because Dr. Samo said, hey, I'm a mere occupational disease specialist. If you want to know about the ideology of a cancer like this, you got to talk to an oncologist. And Dr. Campbell fit the bill. And for that reason, the board expressly gave him paramount weight in its findings and decisions. As such, his conclusion that sob check cancer came from HPV and this was the one tumor type to get that you really can't pin on anything else is dispositive in our view. But you don't have to stop at Dr. Campbell. Dr. Lieberman agreed with that. And so too did Dr. Samo, even though his opinion somewhat weakened after the Arab Laboratories test came back saying that there had been a negative result for the HPV 16 and 18. Again, Dr. Campbell had a good answer for that when he said that sort of cancer becomes deranged and it will lose its P16 positivity, P16 being the genetic marker for this type of cancer. So it's not inconsistent with the record. The opposite conclusion is not clearly evident. And frankly, the suggestion on appeal that this court should overturn the board's determination and side instead with Dr. Orris. And then the anecdotal evidence of deputy chiefs, the card does not square with the manifest weight of the evidence standard. This court's inquiry is to determine whether the board's decision is rooted in the record. And if it is, it should be affirmed under Supreme court precedent. Now, again, I'd like to underscore that there is no suggestion or even a whiff of something improper going on with the board's legal standard. Notably sob check today and in his briefing has cited zero evidence to suggest that other than mere innuendo with the board's IME doctors. He also cannot articulate what this mystery standard is that the board held him to. He doesn't make any citation to the board's findings showing that it applied a different standard. And it's because he can't. There's at least five times in the findings and decision where the board said, quote, the petitioner, your subject has failed to meet his burden of proof that his cancer was related to his service as a firefighter. Again, not soul or primary causation just was related. And so too, as another example, the board concluded that the petitioner had quote, failed to carry his burden of showing a nexus, a nexus between his service as a firefighter and his cancer. There's three other examples in there that the court can readily glean, but certainly nothing in the board's findings and decision leads to a conclusion that it was applying some foreign standard of causation. There's also nothing that the board's hearing officer said that was inappropriate. The board's hearing officer accurately stated as recited by this panel that an occupational disease benefit is for firefighters that prove cancer results as a, is a result of service as a firefighter. Then the hearing officer said that the line of duty disability must be causally related or resulting from duty. And subject again, his counsel agreed that those statements were correct. He expounded on those subject. There was no words of correction or disagreement. Again, this was all a post decision, post appeal, post administrative review attempt at skirting the board's factual findings in lieu of seeking a better, a better standard of review. Furthermore, I'd like to underscore that the, that subject tried and failed with the IME physicians to disabuse them of their notion that HPV had everything to do with his cancer and nothing to do with the fire service. Subject didn't even attempt to make this argument in his brief, but this whole CDC thing that he confronted Dr. Lieberman with, Dr. Lieberman very carefully pointed out that that CDC statement had everything to do with a certain type of cancer and nothing to do with the type that subject had. The circuit court hit this head on and it stated in its opinion that during cross-examination, Dr. Lieberman made it clear that the studies in the CDC notice pertaining to HPV and neck cancer are different than the studies and the suggestion of oropharyngeal cancer related to the head and neck. Dr. Lieberman made this a apples and oranges thing. Yeah, the CDC says this, but what we're talking about is this. The board saw through that. And frankly, that is a legal conclusion. I'm sorry, a factual conclusion that is germane only to the board and should not be disturbed on appeal. Finally, again, just to bring this home, this is a complex case in many, many ways, but in many other ways, it's a very simple case. The board had in the record three IME physicians saying that this type of cancer was not caused by the fire service. It was not caused by acts of duty. It was not caused by the cumulative effects of acts of duty. Dr. Samo in particular, when he was confronted with this idea of, hey, could some of these overhaul things that Sopcich was doing might or could have been a factor. Dr. Samo squarely nailed this concept, and he stated for any cancer, any exposure to anything, including laying on the beach, might or could have caused cancer. But Dr. Samo's best judgment was that HPV caused cancer and not the fire service. So again, when counsel states that the board didn't even look for a cause or a way for his job duties to impact the development of his cancer, it's a total falsehood. You can see that clearly in paragraph 88 of the board's findings and decision. And this is where the board attacked head on this notion that smoke could have been a cause or factor in the development of cancer. Now, Dr. Lieberman, yeah, did say that along the lines that Dr. Samo was more or less articulating. But what the board found is, although it's true that, yeah, I suppose it is true that smoke could cause this, Sopcich has not come forward with sufficient evidence to prove that smoke was a cause. And that is where the inquiry on Sopcich's side breaks down. He did not adduce sufficient evidence at the hearing that smoke or anything related to the fire service was a cause. It's not enough just to say it might or it could have been. That is just mere speculation. And so for those reasons, the board's factual determination should not be disturbed and the court should affirm the board in all remaining respects. One final thing concerning this IARC standard concerning the monographs. This would come into play concerning the presumption that may or may not arise with regard to Sopcich's cancer. It is our position that there is no presumption for this type of cancer because as a threshold matter, the IARC has to deem this type of cancer something that is caused by a known carcinogen that is encountered in the fire service. It is not. The IARC did come out with a new monograph recently that says certain types of cancers like mesothelioma, lung cancer, and more of the obvious types of cancers that you would expect a firefighter to encounter are indeed correlated with the fire service. But to say something like this, HPV-caused cancer is not meeting that threshold inquiry. We contend then there is no presumption that ever arises for Sopcich. But even still, even if there was, it is easily rebutted anyway. So it's of no moment. But I will close with the notion that we do not believe that remand is appropriate on this record. We believe the board did everything right and that its factual conclusions are well-blow-worked by the record. But even still, if this matter is to be remanded, new evidence and new consideration of a standard that did not at the time of the hearing is frankly inappropriate. And council's characterization of what the standard says is also incorrect. The IARC monographs do not say writ large that firefighting equals a presumption in favor of cancer. It does not say that there is an association among a general notion that firefighting equals more cancer. That does not matter for final purposes of reviewing the record. So for all of those record reasons, unless there are any questions from the panel, I will yield my remaining time to Ms. Hammer. I see no additional questions at this time. Thank you, counsel. Thank you, Your Honor. Ms. Hammer. Thank you, Your Honor. Good morning, Your Honor's counsel. May it please the court. My name is Angela Hammer and I represent the city of Rockford in this matter. I will do my best to be respectful of everyone's time and not be repetitive of the arguments that attorney Molenski made. I just want to point out that the board used the proper causation standard and that's supported by the record. As the court earlier pointed out, not only did attorney to it provide a copy of the legal standard for causation to the board, but the city did as well. And I would point the court to the city's post-hearing brief bound at pages 3,116 and 17 in the record. I think it's clear that all of the parties agree that Sobchak is not required to prove that his cancer is the sole cause or even the primary cause of his disability in order to obtain a line of duty disability pension benefits. He must prove that the duty-related incident is a causative factor contributing to his disability. And that's clear that the board implemented that causation standard from the board's findings and decision as well. In paragraph 84 on page 3,292, it reads, the petitioner has failed to meet his burden of proof that his act or acts of duty or the cumulative effects thereof caused or contributed to his disability. Specifically, the evidence failed to support petitioner's claim that his service as a firefighter was the cause of his and the board referenced that he just needed to demonstrate that it contributed to his disability, but was not the sole or primary cause of his cancer. So that supports our contention that the board did implement the proper standard of causation in this matter. Additionally, the board heard extensive testimony in this case over the course of multiple days. And ultimately the board as the trier of fact was responsible for overseeing testimony, making credibility determinations and assigning weight to testimony. And in fact, that's exactly what the board did in this case. They determined that Dr. Campbell, a board certified oncologist was the most credible and afforded his testimony the most weight. Likewise, they found Dr. Orris' testimony and exhibits to be plagued by errors and as indicated in their written decision, excuse me, written findings and decision. And therefore they allowed his testimony the least weight. So the board did apply the proper causation standard to determine that Mr. Sobchak failed to meet his burden of proof to be awarded a line of duty disability pension or an occupational disease. And the board found to strike that the board consider all three independent physicians, including Dr. Sammo and Dr. Lieberman, when they concluded to a reasonable degree of medical certainty that cancer was not a type of cancer caused by exposure to heat radiation or a known carcinogen. So in conclusion, Sobchak raises questions of fact before this court, not questions of law. Therefore the manifest weight of the evidence is the proper standard of review. And Sobchak failed to meet his burden of proof before the board to be awarded either a line of duty disability pension benefit or an occupational disease pension benefit. And the board properly granted Sobchak a non-duty disability pension. And for those reasons, in addition to what attorney Modolinsky indicated, we request this court affirm the board's decision to deny Sobchak's line of duty and occupational disease disability pension benefits. Thank you counsel. Mr. Tewitt, rebuttal? Yes, I'll just try to be hit the highlights here. Again, all we had to show was that the exposure to carcinogens, which again, there's no doubt to that, that during the overhaul process, they are, they've changed their process. They've luckily, you know, that now they provide them with gear. They don't allow them to be out doing the work exposed to the fumes. Again, Dr. Lieberman specifically answered my question when I said, so if cigarettes can be a concurrent factor with HPV to cause a tumor, a head and throughout the record that that's what was diagnosed. And that's what the CDC guidance discusses. You know, Dr. Lieberman, I said, if he was exposed to other carcinogens, such as an overhaul, could that also then be a concurrent factor? And he said, yes. If I may interrupt, how do you address the specific statement though, that, that Mr. Molenski made that said, what we're really distinguishing here is that statement and you used it in your own phrase could be a cause versus was a cause of his type of cancer. So how do you address that distinguishing that? I don't think that's, that's not the legal standard. Standard is, could it be a cause? Could it be a factor? And he said, yes. And that's all for a legal standard. That's all you need to show. It's not a scientific and that's, that's the confusion between a scientific. Yes. We scientifically know that X and Y equals Z, but that's not how the legal standard goes. If it could be a factor, that's all you have to show a contributing factor. If he had the factor and it could be contributing factor, that's the legal standard, like Protestant, you know, he had PTSD, he was in a truck, it exacerbated his condition. It didn't cause it, but it exacerbated it. Therefore it was compensable. And he got his line of duty pension just because he was afraid of trucks being in trucks and the power went off once. And it reminded him of Afghanistan. And that's the standard. It's not a clear, you know, you can prove scientifically X, Y, and Z. But the other things I wanted to bring up were Dr. Campbell. He testified, he has testified for INSPI in, I think like eight cases, all medical malpractice. This was his first ever occupational question of whether on causation. So he's not an expert in this field. Yes, he knows his oncology, but epidemiology even testified. I am not an epidemiologist. An epidemiologist is a person who determines causation. Dr. Orris is an epidemiologist. So yes, he was oncologist and he provided the answers they wanted to hear, but he had no experience in this. He'd been a medical malpractice examiner, I assume on the part of the defense. So I think with Lieberman agreeing that the concurrent exposure and the HPV could be a factor, the fact we don't know whether he really does have HPV and the very succinct and accurate statement by Dr. Wittig at the University of Wisconsin, dealing with the exact same issues that we're dealing here, where he said that inhaled carcinogens can contribute to the cancer. That's causation. And that's what Mr. Zachert had. Mr. Sopcich had the exact same exposure and developed the exact same type of cancer, we think, because again, we're not sure with this DNA test. So based on that, we think even at a manifest weight standard for them not to even discuss that during their decision. They don't discuss Wittig. They don't discuss Lieberman's decision. They don't discuss causation. They don't discuss factors and sole cause. They just, I mean, in their discussion, everything that I presented, they really just ignored. They said, well, you know, Dr. Orris, we don't believe him. So that shows that they didn't consider all of the evidence that had been presented and weigh all of the evidence and come to the correct decision. Thank you. Thank you. Thank you, counsel. The court will take this matter under advisement and the court stands in recess.